## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,
    Plaintiff,

       v.

MURRAY-OVERHILL PHARMACY, INC.
  aka MURRAYS OVERHILL PHARMACY
and MARTIN BRIAN,
    Defendants.

Civil Action No.

Jury Trial Demanded

### COMPLAINT

Murray-Overhill Pharmacy, Inc., with its pharmacist and co-owner Martin Brian, exploited their access to controlled substances and engaged in a scheme of pills-for-sex. On Sunday, April 18, 2021, police arrived at the rear of the pharmacy due to a report of an unconscious male and female in a car, in which they found drug paraphernalia. Another woman exited the back of the pharmacy followed by Brian. The woman and Brian initially claimed she came to the pharmacy from Maryland—on a Sunday when the pharmacy was closed—to show pictures of her children. Additional investigation resulted in an admission by the woman that she had received oxycodone and alprazolam from Brian and Murray-Overhill Pharmacy for sexual acts for about a year, without any prescription.

Brian and Murray-Overhill engaged in a similar pills-for-sex scheme with at least one other woman. She admitted to investigators that she and Brian initially engaged in an illicit cash-for-sex relationship, until Brian told her he could "save a lot of money if [she] t[ook] pills instead." Brian gave the woman bottles of oxycodone and alprazolam from Murray-Overhill multiple times a week for years, without a prescription in exchange for sex acts. Brian continued in the scheme despite obvious signs that the woman had a heroin use disorder.

Other evidence corroborated the schemes, with over a hundred thousand missing pills of opioids and benzodiazepines; text messages between Brian and the women discussing the arrangements and Brian coaching them on what to say to authorities; lists posted in the pharmacy with the cash price per controlled substance pill; and a bank bag of approximately $50,000.  The United States brings this Controlled Substances Act civil penalty suit to hold Brian and Murray-Overhill Pharmacy accountable for the egregious abuse of their controlled substance privileges.

### PARTIES

1.      Plaintiff is the United States of America.

2.      Defendant Murray-Overhill Pharmacy, Inc. is a Pennsylvania corporate entity. The entity is also sometimes referred to as Murrays Overhill Pharmacy.  Murray-Overhill was owned by Martin and Maxine Brian.  Murray-Overhill was registered with the Pennsylvania pharmacy licensing board.  The Drug Enforcement Administration (DEA) granted Murray-Overhill a registration on February 11, 1992, as a retail pharmacy authorized to purchase and dispense Schedule II-V controlled substances at 32 West State Street, in Media, Pennsylvania. Murray-Overhill surrendered its DEA registration on June 10, 2021 as a result of this investigation.

3.      Defendant Martin Brian is an individual residing in Media, Pennsylvania.  Brian co-owned and managed Murray-Overhill Pharmacy at all times relevant to this Complaint.  He was also the pharmacist manager of Murray-Overhill until the investigation of this matter began. While he was registered with the Pennsylvania pharmacy licensing board as a pharmacist, the state licensing board imposed a suspension of Brian's pharmacy license on or about May 24,

2021 arising out of this investigation.   Brian voluntarily surrendered his pharmacy license effective November 2, 2021.[1]

4.       Defendants Murray-Overhill Pharmacy, Inc. and Martin Brian are collectively referred to as the "defendants."

## JURISDICTION AND VENUE

5.       This action is brought by the United States for civil penalties and injunctive relief under the Controlled Substances Act (CSA), 21 U.S.C. §§ 801-971.

6.       This Court has subject matter jurisdiction over the CSA civil penalties, 21 U.S.C. § 842, pursuant to 21 U.S.C. § 842(c)(1)(A), and 28 U.S.C. §§ 1331, 1345, 1355.

7.       This Court has subject matter jurisdiction over the CSA injunctive relief, 21 U.S.C. §§ 843(f), 882, pursuant to 21 U.S.C. §§ 843(f), 882, and 28 U.S.C. §§ 1331, 1345.

8.       This Court has personal jurisdiction over Murray-Overhill Pharmacy, Inc. because the entity is found in, was incorporated in, transacted business in, was licensed in, and engaged in the illegal conduct alleged below in this District, all of which harmed the public and the United States in this District.

9.       This Court has personal jurisdiction over Martin Brian because he resides in, is domiciled in, transacted business in, was licensed in, and engaged in the illegal conduct alleged below in this District, all of which harmed the public and the United States in this District.

10.       Venue is proper in the Eastern District of Pennsylvania because the defendants reside in this District, and a substantial part of the events or omissions giving rise to the claims occurred in this District, 28 U.S.C. § 1391; the claims accrued in this District, and the defendants

---

[1] As part of that surrender, Brian admitted the inventory discrepancies outlined below.

are found in this District, 28 U.S.C. § 1395; and because the defendants are located, reside, did business, and engaged in the illegal conduct in this District, 21 U.S.C. § 843(f).

## THE CONTROLLED SUBSTANCES ACT

11.     The CSA, 21 U.S.C. § 801 *et seq.*, and its regulations govern the distribution and dispensing of controlled substances.  The CSA establishes strict guidelines "to ensure a sufficient supply for legitimate medical . . . purposes and to deter diversion of controlled substances to illegal purposes.  The substances are regulated because of their potential for abuse and likelihood to cause dependence when abused and because of their serious and potentially unsafe nature if not used under proper circumstances."  75 Fed. Reg. 61613 (Oct. 6, 2010).

**I.      Controlled substances are strictly regulated and scheduled based on their potential for abuse and medical uses.**

12.     Federal legislation dictates how prescription drugs are categorized.  Drugs can be placed in Schedules I through V based on, *inter alia*, their "potential for abuse" and whether they have "a currently accepted medical use in treatment."  21 U.S.C. § 812(b).  For example, Schedule II controlled substances are those that have a "high potential for abuse" that "may lead to severe psychological or physical dependence," but have "a currently accepted medical use in treatment."  *Id.*

13.     Pursuant to legislation and administrative action by DEA:

a)      oxycodone, fentanyl, hydrocodone, and methadone, as well as drugs that contain these ingredients, are opioids categorized as Schedule II controlled substances, *see* 21 C.F.R. § 1308.12; and

b)      alprazolam (including drugs that contain it, and with brand names including Xanax) is a benzodiazepine categorized as a Schedule IV controlled substance, *see* 21 C.F.R. § 1308.14.

II.     **Entities that purchase and dispense controlled substances directly to patients, such as retail pharmacies, are required to register with the DEA and are subject to strict controls.**

14.     The CSA requires those who distribute or dispense controlled substances, including pharmacies that dispense controlled substances pursuant to a prescription, to obtain a DEA registration.  21 U.S.C. § 822(a).  Individuals or entities who have a registration are commonly referred to as "registrants."

15.     The registration requirements for those who dispense are based on the statute's definition of a "dispenser," which is defined as "a practitioner who [] delivers a controlled substance to an *ultimate user*" "pursuant to the lawful order of, a practitioner, including the prescribing and administering of a controlled substance."  21 U.S.C. § 802(10) (emphasis added). That definition includes retail pharmacies that dispense controlled substances directly to patients. *See id.* § 802(21) (defining "practitioner" to include a "pharmacy").  When controlled substances are delivered not pursuant to a valid prescription, the CSA defines this delivery as a "distribution."  *See* 21 U.S.C. § 802(11).[2]

16.     Even when a registrant such as a retail pharmacy falls within the definition of "dispenser" and receives authorization through a DEA registration to dispense controlled substances, it may only dispense a controlled substance as "authorized by their registration and in conformity with the other provisions of" the CSA.  *Id.* § 822(b).

---

[2] Even if the defendants suggest that the conduct at issue here is not "dispensing" since they provided controlled substances to ultimate users without a prescription or other lawful order of a practitioner, the conduct still falls within the definition of "distribution."  The CSA defines "distribute" as "deliver[y of] (other than by administering or dispensing) a controlled substance . . . ." 21 U.S.C. § 802(11).  Defendants' conduct is therefore still subject to liability under the CSA.

III.    **Retail pharmacies registered with the DEA are generally permitted to deliver controlled substances only to patients with a valid prescription for a legitimate medical purpose.**

17.    For those entities such as retail pharmacies registered to dispense, the CSA establishes strict limitations on when a controlled substance can be dispensed to the patient and ultimate user.  It generally provides that, unless a non-pharmacy practitioner dispenses directly or there is an emergency,[3] Schedule II, III, and IV controlled substances can only be dispensed upon a "prescription."  21 U.S.C. § 829(a), (b).

18.    The prescription must also satisfy various other written requirements outlined in 21 C.F.R. § 1306.11 and § 1306.05.

19.    Regardless, a prescription is effective only if issued for a "legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice."  21 C.F.R. § 1306.04(a).

20.    In addition, the CSA's implementing regulations provide direction specifically for pharmacists by providing that "[a] prescription for a controlled substance may only be filled by a pharmacist, acting in the usual course of his professional practice and either registered individually or employed in a registered pharmacy . . . ."  *Id.* § 1306.06.

21.    The CSA's implementing regulations explicitly warn pharmacists of the consequences of dispensing or distributing a controlled substance without satisfying these requirements.  "[A] corresponding responsibility [for proper dispensing of controlled substances] rests with the pharmacist who fills the prescription.  An order purporting to be a prescription

---

[3] Even with an emergency, the "prescribing individual practitioner shall cause a written prescription for the emergency quantity prescribed to be delivered to the dispensing pharmacist" "[w]ithin 7 days after authorizing [the] emergency oral prescription."  21 C.F.R. § 1306.11(d)(4).

issued not in the usual course of professional treatment . . . is not a prescription within the meaning and intent of section 309 of the Act (21 U.S.C. [§ ]829) and the person knowingly filling such a purported prescription . . . shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances."  § 1306.04(a); *see also United States v. Rottschaefer*, 178 F. App'x 145, 147 (3d Cir. 2006) ("The CSA's implementing regulations provide that, to be effective, a prescription must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice . . . ." (internal quotations omitted)).

**IV.     The CSA imposes strict obligations on dispensers to comply with record-keeping requirements to ensure accountability and protect against diversion of controlled substances.**

22.     Entities registered with the DEA to dispense controlled substances are also obligated to comply with important record-keeping and accountability measures to protect against the loss and diversion of controlled substances.

23.     For example, every entity registered to dispense controlled substances is obligated to conduct a biennial inventory that includes "a complete and accurate record of all stocks thereof on hand," 21 U.S.C. § 827(a)(1); 21 C.F.R. § 1304.11(a), (c), (e)(6); "maintain, on a current basis, a complete and accurate record of each such substance . . . received, sold, delivered, or otherwise disposed of by him," including a record of dispensing, 21 U.S.C. § 827(a)(3); 21 C.F.R. § 1304.21(a); § 1304.22(c); and maintain the prescriptions underlying the dispensing, § 1304.04(h).

24.     To the extent a dispenser has a theft or loss of a controlled substance that would impact inventory and accountability counts of the controlled substances, the dispenser is required to file a theft/loss report with the DEA.  21 C.F.R. § 1301.76(b).

**V.     Pharmacies and pharmacists that dispense or distribute without a prescription based on a legitimate medical purpose expose themselves to substantial civil penalties and injunctive relief.**

25.     The CSA imposes substantial civil penalties on pharmacies and pharmacists who dispense or distribute controlled substances in violation of their corresponding responsibility.

26.     Any person "who is subject to the requirements of Part C [of the CSA who] distribute[s] or dispense[s] a controlled substance in violation of [the valid prescription requirement in] section 829 of this title" is subject to a significant civil penalty per violation.  21 U.S.C. § 842(a)(1); *see, e.g.*, *United States v. City Pharmacy, LLC*, No. 3:16-CV-24, 2017 WL 1405164, at *4 (N.D.W. Va. Apr. 19, 2017), *aff'd sub nom. United States v. Wasanyi*, 801 F. App'x 904 (4th Cir. 2020).

27.     Each violation exposes the pharmacy and pharmacist to "a civil penalty of not more than $25,000" for each violation on or before November 2, 2015, and not more than $72,683 for each violation after November 2, 2015.  21 U.S.C. § 842(a)(1), (c)(1)(A); 28 C.F.R. § 85.5.

28.     As for the recordkeeping issues, any person who "refuse[s] or negligently fail[s] to make, keep, or furnish any record, report, notification, declaration, order or order form, statement, invoice, or information required under this subchapter or subchapter II" is also subject to civil penalties.  21 U.S.C. § 842(a)(5).

29.     Each violation of § 842(a)(5) exposes the pharmacy and pharmacist to a maximum civil penalty of $10,000 for violations on or before November 2, 2015, § 842(c)(1)(B)(i), and not more than $16,864 for violations after November 2, 2015, 28 C.F.R. § 85.5.

30.     As for equitable relief, the CSA authorizes the Attorney General "to commence a civil action for appropriate declaratory or injunctive relief relating to violations of this section,

section 842 of this title, or 856 of this title."  21 U.S.C. § 843(f); *see also* 21 U.S.C. § 882

(conferring jurisdiction on the district courts "to enjoin violations of this subchapter").

## FACTS

**I.      Murray-Overhill Pharmacy registered with the DEA in 1992 to start operating as a retail pharmacy.**

31.      As outlined above, defendant Murray-Overhill Pharmacy, Inc. is a Pennsylvania

corporate entity co-owned and operated by pharmacist Martin Brian.  The DEA granted Murray-

Overhill a registration on February 11, 1992, as a retail pharmacy authorized to purchase and

dispense Schedule II-V controlled substances, subject to the CSA, at 32 W. State Street, Media,

Pennsylvania.  Martin Brian and his wife co-owned the three-story building where Murray-

Overhill is located.[4]

32.      Defendant Martin Brian is a citizen of Pennsylvania and resides in Media.  Brian

is a pharmacist who was licensed in Pennsylvania.  Brian was the co-owner and pharmacist-in-

charge at Murray-Overhill at all times relevant to this complaint until the state licensing board

imposed a suspension as a result of the investigation for the conduct at issue here.

**II.      Defendants have a history of being disciplined by the state licensing board and the DEA.**

33.      On July 20, 2001, the state licensing board took disciplinary action against

Murray-Overhill Pharmacy and Brian.  In particular, the state licensing board imposed a fine on

the defendants for expired drugs and failure to maintain equipment and miscellaneous supplies.

According to state licensing board records, the pharmacy admitted the charges and paid the civil

---

[4] After becoming aware of the investigation, property that had been owned and held in the name of Martin Brian was abruptly transferred to remove Martin Brian's name.  Because those transfers were likely fraudulent and only conducted for the purpose of shielding assets from the United States, the United States would pursue collection of those assets if this matter proceeds to litigation.

penalty.  Brian did not respond to his own citation as pharmacist manager of the pharmacy and

did not request any hearings.  Therefore, the state licensing board issued a default judgment

order against him and imposed civil penalties.

34.     In 2012, the DEA imposed its own discipline against Murray-Overhill Pharmacy.

Diversion investigators from the DEA visited the pharmacy and issued a notice of inspection

with respect to improperly dispensing the opioid Suboxone.  Brian claimed that he did not know

it was violation to dispense the opioids based upon the prescriptions at issue.  Therefore, the

DEA issued a letter of admonition on February 15, 2012 to Brian and the pharmacy.



35.   Brian responded by claiming that he would no longer improperly dispense controlled substances in the same way and assured the DEA: "WE BELIEVE WE ARE NOW IN COMPLIANCE WITH CODE FED REG."

MURRAY OVERHILL PHARMACY
32 WEST STATE ST
MEDIA, PA 19063

FEBRUARY 20, 2012

US DEPT, OF JUSTICE
DEA PHILA DIV
600 ARCH ST ROOM 10224
PHILA, PA 19106

DEAR MS DONNETTA SPEARS

REF ATTACHED LTR: AS SOON AS WE IDENTIFIED THAT FILLING CONTROL RXS FOR DR "OFFICE USE" WAS A VIOLATION WE IMMEDIATELY TERMINATED THIS PROCEDURE. WE INITIATED NEW PROCEDURE DESCRIBED BY YOUR AGENT OF FILLING THOSE REQUESTS USING OUR HOUSE INVOICE DOCUMENTING ALL APPROPRIATE DATA. IE DATE FILLED, DRUG , QTY  PHARMACIST , ETC.  THIS PROCEDURE WAS GIVEN TO ALL PHARMACISTS AND PHARM TECHS WORKING IN THE PHARMACY. THE INVOICES ARE MAINTANED IN SEPARATE FILE FOR UP TO 7 YEARS.

WE BELIEVE WE ARE NOW IN COMPLIANCE WITH CODE FED REG.  THANK YOU FOR YOUR ASSISTANCE

RESPECTFULLY,

MARTIN R. BRIAN, RPH
OWNER

## III.   Murray-Overhill Pharmacy was an outlier in opioid purchasing.

36.   A review was conducted of the DEA's Automation of Reports and Consolidated Orders System (ARCOS).  ARCOS is designed to track the delivery of certain controlled substances from the manufacturer all the way through its purchase by a pharmacy or other dispenser.  ARCOS allows the DEA to track the quantity and types of purchases that pharmacies

are making and compare those purchases to other pharmacies. However, the ARCOS system does not track full purchase history for all schedules of controlled substances.

37.    A review of ARCOS showed Murray-Overhill Pharmacy was the largest purchaser of all retail pharmacies in its zip code in early 2021 for buprenorphine, fentanyl, hydrocodone, and oxycodone drug products. The pharmacy led buprenorphine by over 400%:

| Drug Name | Buyer's Name | Total Dosage Units Purchased from 01/01/21 to 05/31/2021 |
|---|---|---|
| BUPRENORPHINE(9064) | MURRAY-OVERHILL PHARMACY | 12,608 |
| BUPRENORPHINE(9064) | PHARMACY 2 | 3,060 |
| BUPRENORPHINE(9064) | PHARMACY 3 | 2,760 |
| BUPRENORPHINE(9064) | PHARMACY 4 | 2,520 |
| BUPRENORPHINE(9064) | PHARMACY 5 | 2,010 |
| BUPRENORPHINE(9064) | PHARMACY 6 | 1,116 |
| BUPRENORPHINE(9064) | PHARMACY 7 | 360 |

38.    In another example, Murray-Overhill Pharmacy was the largest purchaser of all retail phamacies in its zip code in early 2021 for oxycodone:

| Drug Name | Buyer's Name | Total Dosage Units Purchased from 01/01/21 to 05/31/2021 |
|---|---|---|
| OXYCODONE(9143) | MURRAY-OVERHILL PHARMACY | 23,200 |
| OXYCODONE(9143) | PHARMACY 2 | 17,600 |
| OXYCODONE(9143) | PHARMACY 3 | 15,700 |
| OXYCODONE(9143) | PHARMACY 4 | 13,000 |
| OXYCODONE(9143) | PHARMACY 5 | 12,500 |
| OXYCODONE(9143) | PHARMACY 6 | 10,500 |
| OXYCODONE(9143) | PHARMACY 7 | 4,500 |

39.    These data points make clear that Murray-Overhill Pharmacy was a geographic outlier in the purchasing of opioid controlled substances in 2021.

IV. **The Media Borough Police Department and the DEA expose the defendants' sex-for-pills scheme.**

A. **The Media Borough Police Department arrived at the pharmacy on April 18, 2021.**

40.    On Sunday, April 18, 2021, the Media Borough Police Department and an ambulance were dispatched to an address at the rear of Murray-Overhill Pharmacy, for a report of an unconscious male (Third-Party 1) and female (Third-Party 2) in a vehicle.

41.    The Media Borough Police Department believed that Third-Party 1 and Third-Party 2 were under the influence of a controlled substance based on their observations, experience, and training, and drug paraphernalia was located in the backseat of the vehicle.

42.    Third-Party 1 and Third-Party 2 informed the officers that they were waiting on a female friend (Drug Recipient 1), who was picking up a prescription at Murray-Overhill Pharmacy.

43.    Murray-Overhill Pharmacy was not open to the public on Sundays.

44.    Drug Recipient 1 exited the back door of Murray-Overhill Pharmacy.

45.    Drug Recipient 1 saw the police and immediately went back inside the pharmacy. She later exited the pharmacy again.

46.    Brian also exited the back door of Murray-Overhill Pharmacy and asked what was going on.  Both Brian and Drug Recipient 1 claimed that Drug Recipient 1 was there from Maryland to show Brian pictures of Drug Recipient 1's children.

47.    Media police questioned Drug Recipient 1, Third-Party 1, and Third-Party 2. Media police later obtained search warrants for Drug Recipient 1 and Third-Party 2's phones and consent to search Third-Party 2's vehicle.  Officers found evidence of drug use, a large amount

of money, and investigtors discovered a text message from Drug Recipient 1's cell phone that read, "I had 60 30s and 60 zanies but I had to toss them inside when I saw them all out here."



48.     The term "30s" is frequently used to refer to 30mg dosage units of Schedule II opioid oxycodone.  The term "zanies" is frequently used to refer to Xanax, the brand name for the Schedule IV benzodiazepine alprazolam.

**B.    The DEA conducted an audit of the pharmacy that revealed over a hundred thousand missing opioid and benzodiazepine dosage units.**

49.     On April 20, 2021, the DEA conducted an audit and inspection at Murray-Overhill Pharmacy, with the consent of Brian, pursuant to 21 U.S.C. § 880(c)(1); 21 C.F.R. §§ 1316.06, 1316.08.

50.     The DEA inspection revealed an extensive number of controlled substance violations.

51.     For example, Brian admitted to the DEA that Murray-Overhill Pharmacy had not conducted a biennial inventory of its Schedule II or III-V controlled substances, in violation of 21 U.S.C. § 827(a)(1); 21 C.F.R. § 1304.11(a), (c), (e)(6).

52.     In addition, the pharmacy had failed to log the quantity received and date received of their controlled substances, in violation of 21 U.S.C. § 827(a)(3); 21 C.F.R. § 1304.21(a).[5]

---

[5] This violation occurred because the pharmacy had failed to log the date received or quantity received in its controlled substance ordering system (CSOS) record on its computer, in violation of 21 C.F.R. § 1305.22(g).

53.     Brian or an employee also claimed that the pharmacy had been robbed twice at gun point, the most recent of which occurred about three years ago, but Brian admitted to the DEA he had never reported the purported thefts, in violation of 21 C.F.R. § 1301.76(b).

54.     The DEA inspection revealed a number of other regulatory violations.[6]

55.     An audit of Brian and Murray-Overhill Pharmacy's controlled substance inventory revealed significant discrepancies and missing controlled substance pills or other dosage units.

56.     The controlled substance audit conducted was for the five-year period of April 20, 2016 to April 20, 2021 on Schedules II - IV controlled substances.[7]  Of the controlled substances audited, 24 of the controlled substances had a negative difference, reflecting pills or other dosage units that had been received and were missing, but for which there was no record of them being dispensed, transferred, or destroyed in the ordinary course of business.  The negative differences are indicators of diversion.  The significant pill shortages included:

a)      Alprazolam 0.25mg – Short approximately 228 tablets

b)      Alprazolam 0.5mg – Short approximately 5,610 tablets

---

[6] While Brian is the only person with authority to order Schedule II controlled substances for the pharmacy through their CSOS system, Brian stated that everyone in the pharmacy has access and adds to the order each day, in violation of 21 C.F.R. § 1311.30(a).

Brian also stated that he is the only person in the pharmacy with a power of attorney and authority to order Schedule II controlled substances through their CSOS system, but he allows everyone to order throughout the day, in violation of 21 C.F.R. § 1305.05(a).

Brian also failed to complete several of their DEA 222 order forms with the necessary information, in violation of 21 C.F.R. § 1305.13(e).

[7] While the DEA had the records from Murray-Overhill's drug distributor to establish the drugs received, the DEA asked the pharmacy for dispensing records but only received Schedule II dispensing records.  Therefore, the DEA used prescription drug monitoring program data to calculate the dispensing figures.

c)      Alprazolam 1.0mg – Short approximately 11,358 tablets

d)      Alprazolam 2.0mg – Short approximately 31,973.5 tablets

e)      Fentanyl 50mcg – Short approximately 440 patches

f)      Fentanyl 100mcg – Short approximately 4,105 patches

g)      Hydrocodone APAP 5/325mg – Short approximately 4,538 tablets

h)      Hydrocodone APAP 7.5/325mg – Short approximately 20,580 tablets

i)      Hydrocodone APAP 10/325mg – Short approximately 14,433 tablets

j)      Methadone 10mg – Short approximately 9,847 tablets

k)      Oxycodone 5mg – Short approximately 369 tablets

l)      Oxycodone 10mg – Short approximately 7,203 tablets

m)      Oxycodone 30mg – Short approximately 58,483 tablets

n)      Oxycodone 80mg extended release – Short approximately 5,786 tablets

57.      When the DEA approached Brian with these discrepancies and asked him for an explanation for over a hundred thousand missing dosage units of opioids and benzodiazepines, Brian could not provide any explanation.  When the DEA asked Brian about Drug Recipient 1 exiting the pharmacy, Brian declined any further conversation until he spoke with an attorney.

58.      When Brian surrendered his state pharmacy license, he admitted to many of the inventory discrepancies above, including as to oxycodone 30mg[8] and alprazolam.  Brian also admitted he had no explanation for the discrepancies.

---

[8] The discrepancy calculation for oxycodone 30mg described above differs slightly from the oxycodone 30mg discrepancy calculation listed in the state licensing order in which Brian surrendered his pharmacy license.

**C.      Additional investigation revealed the sex-for-pills and cash scheme.**

59.      The DEA interviewed Drug Recipient 1.

60.      Drug Recipient 1 admitted that she had first met Brian approximately one year prior.

61.      Since that time, Drug Recipient 1 and Brian would communicate by phone and text message on when to meet at the pharmacy.

62.      Drug Recipient 1 admitted that she would meet Brian about one to two times per week, such as Tuesdays or Sundays, or an additional visit when she needed extra money or drugs.

63.      Drug Recipient 1 told the DEA that 3 out of every 4 times she met Brian their interaction would be sexual acts for drugs, with the remaining time involving sexual acts by Drug Recipient 1 in exchange for money paid by Brian.[9]

64.      Drug Recipient 1 did not have a prescription for these drugs.

65.      Drug Recipient 1 admitted that she received "30s and zanie bars" for the sexual acts.

66.      While not knowing the full name of the "30s," Drug Recipient 1 informed the DEA that the pills she received were round, blue, had an "M" on one side, and a "30" on the other side.  The DEA confirmed that the description provided by Drug Recipient 1 matched that of oxycodone 30mg tablets that Murray-Overhill purchased and received.

67.      Drug Recipient 1 sold the oxycodone pills to fund her heroin use disorder.

---

[9] Brian would purportedly loan money to Drug Recipient 1 as well.  Drug Recipient 1 would repay the loan with money received from her unemployment check.  Drug Recipient 1 would also, as alleged above, perform sexual acts in exchange for money from Brian.

68.     As for the "zanies," Drug Recipeint 1 described those as white and rectangular in shape.  The DEA confirmed that alprazolam 2mg is white, oblong, and multi-scored.  As described above, Murray-Overhill Pharmacy was missing 31,973.5 dosage units of alprazolam 2mg.

69.     Drug Recipient 1 also told the DEA that Brian knew she was pregnant when he provided her with the controlled substances and money in exchange for sexual acts.

70.     Drug Recipient 1 also informed the DEA that, on one occasion, Drug Recipient 1 also saw a woman enter the pharmacy the way that Drug Recipient 1 would do it, from the rear of the pharmacy, prior to opening.



71.     The DEA obtained the text messages extracted from Drug Recipient 1's phone as a result of the state search warrant.  There was a contact for Murray's Pharmacy with a mobile phone number, which was later found to be Brian's mobile phone.

72.    The DEA extracted text message excerpts, including text messages between Drug Recipient 1 and Brian, from at least April 16, 2021 through April 18, 2021,[10] which is when Drug Recipient 1's cell phone was seized.

73.    The texts of April 16, 2021 through April 18, 2021 between Drug Recipient 1 and Brian are communications about their meeting, Drug Recipient 1 bringing friends, and Drug Recipient 1 sending pictures or videos.  For example, below are some of those messages:



_____

[10] Drug Recipient 1 changed phones sometime before April 16, 2021.  The DEA successfully extracted text messages on the newer phone.  However, not all of the older messages were transferred to the new phone and, accordingly, the text messages alleged here are included with respect to that later timeframe.



74.     Drug Recipient 1 advised that no other person ever came along with Drug Recipeint 1 inside Murray-Overhill Pharmacy.

75.     As mentioned above, after the police arrived at the pharmacy, there was also a text message from Drug Recipient 1's cell to a third-party's cell phone, that read:



76.     The references to oxycodone 30mg tablets and alprazolam tablets refer to two of the drugs of which Murray-Overhill Pharmacy was missing tens of thousands of tablets.

77.     On April 18, 2021, the date of the incident, Drug Recipient 1 texted Brian that she

put the pills back inside, and Brian coached Drug Recipient 1 on what to say to the police:



78.     Drug Recipient 1 died on July 18, 2021.  The immediate cause of death, according

to the death certificate, was listed as "pneumonia associated with COVID-19 viral infection," but

also explained that "[o]ther significant conditions contributing to death but not resulting in the

underlying cause" included "mixed drug use" of "cocaine, fentanyl, despropionyl fentanyl, para-

fluorofentanyl, acrylfentanyl, xylazine, methadone, and methamphetamine."

**V.     The state licensing board suspended Brian's pharmacist license as a result of the conduct revealed in this investigation.**

79.     On or about May 24, 2021, based upon the conduct discovered in this

investigation, the Commonwealth of Pennsylvania deemed Brian's continued practice as a

pharmacist within Pennsylvania, along with the exercise of any other authorizations to practice

the profession issued by the Board, "an immediate and clear danger to public health and safety."

80.     Therefore, the Board of Pharmacy suspended Brian's pharmacist license and

served an immediate temporary suspension upon Brian through his legal counsel on or about

May 25, 2021.

---

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF STATE**
**BEFORE THE STATE BOARD OF PHARMACY**

| | |
|---|---|
| **Commonwealth of Pennsylvania,**<br>**Bureau of Professional and**<br>**Occupational Affairs**<br>         **vs.** | **Case No.**          **21-54-008478** |
| **Martin Brian, R.Ph**<br>              **Respondent** | |

**ORDER OF TEMPORARY SUSPENSION AND NOTICE OF HEARING**

AND NOW, this _24th_ day of May 2021, upon review of the Petition for Temporary

Suspension of the license to practice as a pharmacist held by Martin Brian, R.Ph (*hereinafter*

"Respondent"), license number RP024540L, filed by the Prosecuting Attorney for the

Commonwealth of Pennsylvania, the State Board of Pharmacy (*hereinafter* "Board") makes the

following findings and enters the following Order:

**SUSPENSION ORDER**

---

81.     As mentioned above, Brian later surrendered his state pharmacist license.

**VI.    The Media Borough Police Department executed search warrants that uncovered more evidence of the pharmacy and Brian's scheme.**

82.     On May 25, 2021, the Media Borough Police Department executed search

warrants as part of the investigation.

83.     In the course of executing the warrants, among other things, the police searched a locked file cabinet found next to Brian's desk.  Inside the lower drawer was a white paper pharmacy bag that contained a pair of pink-laced panties and rope, and a bank bag that contained approximately $50,000.00 in cash.



84.     There were also notes posted in the prescription dispensing area behind the computer screen that listed prices of narcotics by each pill, *e.g.*, oxycodone 30mg $3.00 ea.



**VII.    Brian engaged in a similar sex-for-drugs scheme with at least one other woman.**

85.     In addition to the physical search warrant, police also executed a search warrant on Brian's cellular phone.

86.     Text messages on Brian's phone revealed conversations with another woman, Drug Recipient 2.

87.     Investigators interviewed Drug Recipient 2, who resides in Maryland.

88.     Drug Recipient 2 told investigators that she met Brian approximately eight years prior on a "sugar daddy" website, which she explained to mean an online site for wealthy men seeking companionship from another in exchange for benefits like cash.

89.     Approximately three years prior, Drug Recipient 2 was kicked out of her parents' house after discovering she was using heroin.

90.     Now homeless, Drug Recipient 2 began meeting with Brian in person.

91.     At first, the two met in a hotel room.

92.     Later, Brian directed Drug Recipient 2 to come to the back door of Murray-Overhill Pharmacy where the two engaged in sexual or other acts.

93.     Drug Recipient 2 told investigators that on some occasions Brian would tie her up and would use the rope located at the pharmacy.

94.     Approximately two or more years prior, Brian told Drug Recipient 2, "I could save a lot of money if you take pills instead."

95.     Drug Recipient 2 warned Brian that to pay her in pills was likely to alert regulators.

96.     Despite this warning, Brian began supplying Drug Recipient 2 with significant quantities of oxycodone and alprazolam.

97.     Drug Recipient 2 never supplied Brian or Murray-Overhill with a prescription.

98.     Drug Recipient 2 estimated she met with Brian two to four times each week over this more than two-year period.  At each meeting, Brian provided her with manufacturer bottles of 200 count oxycodone 15mg tablets or 100 count oxycodone 30mg tablets.

99.     Brian also gave Drug Recipient 2 manufacturer bottles of 500 alprazolam 2mg tablets every few months over the same time period.

100.    Drug Recipient 2 sold the controlled substances to fund her heroin use disorder.

101.    As Drug Recipient 2's addiction worsened, her physical condition also deteriorated.  Among other things, Drug Recipient 2 had her arm amputated because of her repeated drug use and dereliction of treatment.

102.    Despite this deterioration and its obvious connection to her illicit drug use, Brian continued to see Drug Recipient 2 and exchange sexual acts for narcotics and other controlled substances.

103.    Before investigators contacted her, Drug Recipient 2 told Brian the police sought to speak to her.  In response to this lie, and as he did with Drug Recipient 1, Brian coached Drug Recipient 2 on what to say to law enforcement.  In response to what would happen if authorities inquired about the controlled substance prescriptions, Brian remarked: "I'm fucked."



104.    On November 1, 2021, the Commonwealth of Pennsylvania filed criminal charges against Brian in Delaware County.  Brian was charged with:

a)      two counts of manufacture, delivery, or possession with intent to manufacture or deliver a controlled substance, 35 P.S. § 780-113(a)(30);

b)      two counts of administering, dispensing, delivering, gifting, or prescribing a controlled substance outside the course of his professional practice, outside the scope of a patient relationship, and outside the treatment principles accepted by a responsible segment of the medical profession, 35 P.S. § 780-113(a)(14);

c)      two counts of selling, dispensing, or distributing a controlled substance by a medical practitioner to a person that the medical practitioner knows or has reason to know is a drug dependent person, 35 P.S. § 780-113(a)(13);

d)      two counts of criminal use of a communication facility, 18 Pa. C.S. § 7512(a); and

e)      two counts of sexual extortion, 18 Pa. C.S. § 3133(a)(1).

## COUNT I:
### Unlawful Dispensing or Distribution of Controlled Substances:
### 21 U.S.C. §§ 842(a)(1), 829

105.     The United States realleges the above paragraphs as if fully set forth herein.

106.     Defendants Murray-Overhill Pharmacy and Martin Brian are subject to the requirements of Part C of the CSA, 21 U.S.C. § 822.

107.     As outlined above, Murray-Overhill Pharmacy and Martin Brian illegally dispensed or distributed[11] controlled substances, including oxycodone and alprazolam, without a valid and effective prescription on multiple occasions, in violation of 21 U.S.C. § 829.

---

[11] Again, as outlined above, even if the defendants somehow suggest that the conduct at issue here is not "dispensing" since they provided controlled substances to ultimate users without a prescription or other lawful order of a practitioner, the conduct still falls within the definition of

108.    Examples of the violations are outlined in Exhibit A.

109.    As a result of the violations set forth above and additional violations to be discovered during the investigation and discovery, defendants Murray-Overhill Pharmacy and Martin Brian are subject to the relief set forth in the CSA.

**COUNT II:**
**Refusal to Comply with Controlled Substances Act Record-Keeping Requirements:**
**21 U.S.C. § 842(a)(5)**

110.    The United States realleges the above paragraphs as if fully set forth herein.

111.    Defendants Murray-Overhill Pharmacy and Martin Brian repeatedly refused or negligently failed to make, keep, or furnish records, reports, notifications, orders and order forms, statements, invoices, and information required by the CSA.

112.    As outlined above, defendants Murray-Overhill Pharmacy and Martin Brian refused or negligently failed to make, keep, and furnish an accurate biennial inventory of the firm's controlled substances as required by 21 U.S.C. § 827(a)(1); 21 C.F.R. § 1304.11, for each of their controlled substance drugs in inventory.

113.    In addition, defendants Murray-Overhill Pharmacy and Martin Brian refused or negligently failed to make, keep, and furnish accurate records, reports, notifications, orders and order forms, statements, invoices, and information to properly document its inventory and dispensing and distribution of the controlled substance outlined above, as required by 21 U.S.C. § 827(a)(1), (a)(3); 21 C.F.R. §§ 1304.11, 1304.21(a), 1304.22(c), as made clear when it failed to pass the accountability audit.

---

"distribution."  *See* 21 U.S.C. § 802(11).  The conduct is therefore still subject to CSA civil penalties.  *See* § 842(a)(1) (making it unlawful to "distribute or dispense a controlled substance in violation of section 829 of this title").

114.     In addition, defendants Murray-Overhill Pharmacy and Martin Brian refused or negligently failed to make, keep, and furnish accurate records, reports, notifications, orders and order forms, statements, invoices, and information when they failed to log the quantity received and date received of their controlled substances, in violation of 21 U.S.C. § 827(a)(3); 21 C.F.R. § 1304.21(a).

115.     In addition, defendants Murray-Overhill Pharmacy and Martin Brian refused or negligently failed to make, keep, and furnish accurate records, reports, notifications, orders and order forms, statements, invoices, and information when they failed to create and make a theft-loss report to the DEA, in violation of 21 C.F.R. § 1301.76(b).

116.     Examples of the violations are outlined in Exhibit A.

117.     As a result of the violations set forth above and additional violations to be discovered during the investigation and discovery, defendants Murray-Overhill Pharmacy and Martin Brian are subject to the relief set forth in the CSA.

## PRAYER FOR RELIEF

WHEREFORE, the United States of America demands judgment against defendants Murray-Overhill Pharmacy and Martin Brian as follows:

118.     For violations of 21 U.S.C. § 842(a)(1), civil penalties of up to $25,000 per violation occurring on or before November 2, 2015, 21 U.S.C. § 842(c)(1)(A); and civil penalties of up to $72,683 per violation occurring after November 2, 2015, 28 C.F.R. § 85.5;

119.     For violations of 21 U.S.C. § 842(a)(5), civil penalties of up to $10,000 per violation occurring on or before November 2, 2015, 21 U.S.C. § 842(c)(1)(B)(i); and civil penalties of up to $16,864 per violation occurring after November 2, 2015, 28 C.F.R. § 85.5;

120.    Entry of a permanent injunction to restrain future violations, pursuant to 21 U.S.C. §§ 843(f), 882, enjoining defendants from obtaining, possessing, administering, distributing, or dispensing controlled substances in the future; and

121.    Post-judgment interest, costs, and such other and further relief as the Court deems just and equitable.

## JURY DEMAND

The United States hereby demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Respectfully submitted,

  /s/ Nelson S.T. Thayer, Jr. for
JACQUELINE C. ROMERO
United States Attorney

  /s/ Gregory B. David
GREGORY B. DAVID
Assistant United States Attorney
Chief, Civil Division

  /s/ Charlene Keller Fullmer
CHARLENE KELLER FULLMER
Assistant United States Attorney
Deputy Chief, Civil Division

  /s/ Anthony D. Scicchitano
ANTHONY D. SCICCHITANO
Assistant United States Attorney
PA 208607
United States Attorney's Office
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106
(215) 861-8380
anthony.scicchitano@usdoj.gov

*Attorneys for the United States of America*

Dated: July 26, 2022

**Exhibit A to Complaint**

*United States v. Murray-Overhill Pharmacy, Inc. and Martin Brian*

**Drug Recipient 1**

| | |
|---|---|
| *Duration of Encounters* | 1 year |
| *Frequency of Encounters* | 1-2 times a week, 3/4 involved sex for drugs |
| *Drugs per Interaction* | 2 distributions each time |
| *Approx. Total Potential Violations* | 78-156 violations |
| *Approx. Total Maximum Penalty* | $5,669,274-$11,338,548 |

**Drug Recipient 2**

| | |
|---|---|
| *Duration of Encounters* | 2+ years |
| *Frequency of Encounters* | 2-4 times a week |
| *Drugs per Interaction* | 1 bottle of oxycodone each time, 1 bottle of alprazolam every few months |
| *Approx. Total Potential Violations* | 208-416 oxycodone violations + alprazolam violations |
| *Approx. Total Maximum Penalty* | $15,118,064-$30,236,128 |

**Record-Keeping Violations**

| | |
|---|---|
| *Biennial Inventory Violations* | Up to $16,864 per violation |
| *Inventory, Dispensing, Distribution Violations* | Up to $16,864 per violation |
| *Qty and Date Rec'd Violations* | Up to $16,864 per violation |
| *Theft-Loss Report Violation* | Up to $16,864 per violation |

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**

United States of America

**DEFENDANTS**

Murray-Overhill Pharmacy, Inc., and Martin Brian

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant  Delaware County, PA
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
AUSA Anthony D. Scicchitano
U.S. Attorney's Office, 615 Chestnut Street, Suite 1250
Philadelphia, PA 19106 (215) 861-8380

Attorneys *(If Known)*
Elizabeth Lippy, Esquire, Fairlie & Lippy P.C.
1501 Lower Sate Road, Ste. 304, Bldg. F
North Wales, PA 19454; 215-997-1000

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☒ 1  U.S. Government Plaintiff | ☐ 3  Federal Question *(U.S. Government Not a Party)* |
| ☐ 2  U.S. Government Defendant | ☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)* |

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☒ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | | ☐ 790 Other Labor Litigation | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 791 Employee Retirement Income Security Act | ☐ 862 Black Lung (923) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | **FEDERAL TAX SUITS** | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | **IMMIGRATION** | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| | | ☐ 550 Civil Rights | ☐ 465 Other Immigration Actions | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

**V. ORIGIN** *(Place an "X" in One Box Only)*

| | | | | | |
|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer   ☐ 8 Multidistrict Litigation - Direct File |

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Controlled Substances Act, 21 U.S.C. §§ 801-971
Brief description of cause:
Civil complaint for injunctive relief, and civil penalties under the Controlled Substances Act

**VII. REQUESTED IN COMPLAINT:**   ☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

**VIII. RELATED CASE(S) IF ANY**   *(See instructions):*   JUDGE _____   DOCKET NUMBER _____

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| Jul 26, 2022 | /s/ AUSA Anthony D. Scicchitano |

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)**   **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)**   **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)**   **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**   **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked**. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.)**

**III.**   **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.**   **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: <u>Nature of Suit Code Descriptions</u>.

**V.**   **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.**   **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.**   **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**   **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

UNITED STATES DISTRICT COURT
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**DESIGNATION FORM**
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: _____ 615 Chestnut Street, Ste. 1250, Philadelphia, PA _____

Address of Defendant: _____ 32 W. State Street, Media, Pennsylvania _____

Place of Accident, Incident or Transaction: _____ 32 W. State Street, Media, Pennsylvania _____

---

*RELATED CASE, IF ANY:*

Case Number: _____ Judge: _____ Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?     Yes ☐   No ☑

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?     Yes ☐   No ☑

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court?     Yes ☐   No ☑

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?     Yes ☐   No ☑

I certify that, to my knowledge, the within case ☐ is / ☑ is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: __07/26/2022__     __/s/ Anthony D. Scicchitano, AUSA__     __PA 208607__
                                        *Attorney-at-Law / Pro Se Plaintiff*          *Attorney I.D. # (if applicable)*

---

**CIVIL: (Place a √ in one category only)**

*A.*    *Federal Question Cases:*                            *B.*    *Diversity Jurisdiction Cases:*

☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts      ☐ 1. Insurance Contract and Other Contracts
☐ 2. FELA      ☐ 2. Airplane Personal Injury
☐ 3. Jones Act-Personal Injury      ☐ 3. Assault, Defamation
☐ 4. Antitrust      ☐ 4. Marine Personal Injury
☐ 5. Patent      ☐ 5. Motor Vehicle Personal Injury
☐ 6. Labor-Management Relations      ☐ 6. Other Personal Injury *(Please specify):* _____
☐ 7. Civil Rights      ☐ 7. Products Liability
☐ 8. Habeas Corpus      ☐ 8. Products Liability – Asbestos
☐ 9. Securities Act(s) Cases      ☐ 9. All other Diversity Cases
☐ 10. Social Security Review Cases              *(Please specify):* _____
☑ 11. All other Federal Question Cases
     *(Please specify):* _____ Controlled Substances Act _____

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, __AUSA Anthony D. Scicchitano__ , counsel of record *or* pro se plaintiff, do hereby certify:

☐    Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs:

☑    Relief other than monetary damages is sought.

DATE: __07/26/2022__     __/s/ Anthony D. Scicchitano, AUSA__     __PA 208607__
                                        *Attorney-at-Law / Pro Se Plaintiff*          *Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

Civ. 609 (5/2018)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**CASE MANAGEMENT TRACK DESIGNATION FORM**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | : |
|     Plaintiff, | : |
|  | : |
|       v. | : |
|  | : |
| MURRAY-OVERHILL PHARMACY, INC. | : |
| and  MARTIN BRIAN, | : |
|     Defendants. | : |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants.  (See § 1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.    ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
    and Human Services denying plaintiff Social Security Benefits.    ( )

(c) Arbitration – Cases required to be designated for arbitration under Local
    Civil Rule 53.2.    ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
    exposure to asbestos.    ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
    commonly referred to as complex and that need special or intense management by
    the court.  (See reverse side of this form for a detailed explanation of special
    management cases.)    ( )

(f)  Standard Management – Cases that do not fall into any one of the other tracks.    (X)

| 07/26/2022 | /s/ Anthony D. Scicchitano | United States of America |
|---|---|---|
| Date | Anthony D. Scicchitano, Attorney-at-law | Attorney for |

| 215.861.8380 | 215.861.8618 | anthony.scicchitano@usdoj.gov |
|---|---|---|
| Telephone | Fax Number | E-Mail Address |

**(Civ. 660) 10/02**

**Civil Justice Expense and Delay Reduction Plan**
**Section 1:03 - Assignment to a Management Track**

(a)        The clerk of court will assign cases to tracks (a) through (d) based on the initial pleading.

(b)        In all cases not appropriate for assignment by the clerk of court to tracks (a) through (d), the plaintiff shall submit to the clerk of court and serve with the complaint on all defendants a case management track designation form specifying that the plaintiff believes the case requires Standard Management or Special Management.  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a case management track designation form specifying the track to which that defendant believes the case should be assigned.

(c)        The court may, on its own initiative or upon the request of any party, change the track assignment of any case at any time.

(d)        Nothing in this Plan is intended to abrogate or limit a judicial officer's authority in any case pending before that judicial officer, to direct pretrial and trial proceedings that are more stringent than those of the Plan and that are designed to accomplish cost and delay reduction.

(e)        Nothing in this Plan is intended to supersede Local Civil Rules 40.1 and 72.1, or the procedure for random assignment of Habeas Corpus and Social Security cases referred to magistrate judges of the court.

**SPECIAL MANAGEMENT CASE ASSIGNMENTS**
**(See §1.02 (e) Management Track Definitions of the**
**Civil Justice Expense and Delay Reduction Plan)**

Special Management cases will usually include that class of cases commonly referred to as "complex litigation"  as that term has been used in the Manuals for Complex Litigation.  The first manual was prepared in 1969 and the Manual for Complex Litigation Second, MCL 2d was prepared in 1985.  This term is intended to include cases that present unusual problems and require extraordinary treatment.  See §0.1 of the first manual.  Cases may require special or intense management by the court due to one or more of the following factors:  (1) large number of parties; (2) large number of claims or defenses; (3) complex factual issues; (4) large volume of evidence; (5) problems locating or preserving evidence; (6) extensive discovery; (7) exceptionally long time needed to prepare for disposition; (8) decision needed within an exceptionally short time; and (9) need to decide preliminary issues before final disposition.  It may include two or more related cases.  Complex litigation typically includes such cases as antitrust cases; cases involving a large number of parties or an unincorporated association of large membership; cases involving requests for injunctive relief affecting the operation of large business entities; patent cases; copyright and trademark cases; common disaster cases such as those arising from aircraft crashes or marine disasters; actions brought by individual stockholders; stockholder's derivative and stockholder's representative actions; class actions or potential class actions; and other civil (and criminal) cases involving unusual multiplicity or complexity of factual issues.  See §0.22 of the first Manual for Complex Litigation and Manual for Complex Litigation Second, Chapter 33.